OPINION
 

 KING, District Judge.
 

 Two environmental organizations, the Oregon Natural Desert Association (“ONDA”) and the Center for Biological Diversity (“CBD”), bring an action against the United States Forest Service and a forest supervisor. Plaintiffs allege defendants are violating the National Wild and Scenic Rivers Act (‘WSRA”), the National Forest Management Act (“NFMA”), the National Environmental Policy Act (“NEPA”), and the Rescissions Act, by failing to implement the Malheur and
 
 *MCCCLXXXII
 
 North Fork Malheur comprehensive river management plans, by failing to “protect and enhance” the river corridors’ “outstandingly remarkable values,” by failing to ensure that the annually-authorized livestock grazing practices are consistent with several environmental plans, and by failing to undertake the required environmental analysis for the protection of wildlife, fish and other river corridor values. Before the court are defendants’ motions for judgment on the pleadings and motion to dismiss. For the following reasons, I deny the motions.
 

 FACTUAL BACKGROUND
 

 The Forest Service manages livestock grazing on the national forests by using three separate decisionmaking processes: federally issued grazing permits, allotment management plans (“AMPs”), and annual operating plans (“AOPs”).
 
 [1]
 

 A grazing permit is a “document authorizing livestock to use National Forest System or other lands under Forest Service control for the purpose of livestock production.” 36 C.F.R. § 222.1(b)(5). Permits are generally issued for periods of ten years.
 
 Id.
 
 § 222.3(c)(1). Permits are issued according to a priority system tied to ownership of private “base property” and set limits on allowable numbers of livestock and seasons of use, based on an allotment’s estimated ability to sustain certain average levels of use.
 
 See, e.g., id.
 
 § 222.3(c)®, (ii); 43 U.S.C. § 1752 (explaining scope and requirements of grazing permit terms and conditions).
 

 An AMP is an allotment-specific planning document that (1) prescribes the manner in, and extent to which, grazing operations will be conducted in order to meet multiple use and other goals and objectives; (2) describes any range improvements in place or to be installed and maintained to meet allotment objectives; and (3) contains any other grazing management provisions and objectives prescribed by the Forest Service. 36 C.F.R. § 222.1(b)(2); Complaint at ¶ 63.
 

 An AOP is a signed agreement issued annually by the Forest Service to a per-mittee, which sets final authorized dates of grazing (“season of use”), pasture and grazing system rotations, numbers of livestock permitted for the upcoming season, monitoring and reporting requirements, and maximum limits of forage use by livestock. Complaint at ¶ 67.
 

 Plaintiffs explain that each of the three documents represents a unique decision-making process and the agency makes different types of decisions in each document. For example, according to plaintiffs, the initial decision to graze or not to graze livestock on a particular parcel of land is usually made by either issuance of a grazing permit or in the context of an amendment to a Forest Plan. In contrast, the Forest Service uses an AMP to set more long-term goals, planning for range improvements, and determining how grazing within the particular AMP area will be consistent with the Forest Service’s multiple use requirements. Finally, plaintiffs contend that the Forest Service makes each year’s on-the-ground grazing decisions by the issuance of AOPs. This is where the Forest Service makes determinations of animal numbers, specific on and off dates, pasture rotations, and forage use limits. Plaintiffs allege that AOPs also generally specify any species of concern and habitat objectives for the allotment at issue and incorporate specific grazing standards. For example, plaintiffs point out that the AOPs at issue in this case incorpo
 
 *MCCCLXXXIII
 
 rate various grazing standards set by the U.S. Fish and Wildlife Department’s biological opinions for bull trout. It appears that AOPs are a means for the agency to incorporate factors that it could not possibly anticipate and plan for in a ten-year permit or a long-term AMP-such as drought conditions, timing of rainfall over the course of a given grazing season, the success or failure of habitat restoration projects on an allotment, current water quality, or the current degree of risk to imperiled species affected by grazing (e.g., bull trout).
 

 LEGAL STANDARDS
 

 Any party may move for judgment on the pleadings after the pleadings are closed. Fed.R.Civ.P. 12(c). The allegations of the nonmoving party are accepted as true; the allegations of the moving party which have been denied are assumed to be false. Judgment on the pleadings is appropriate when there is no material issue of fact and the moving party is entitled to judgment as a matter of law.
 
 Hal Roach Studios v. Richard Feiner & Co.,
 
 896 F.2d 1542, 1550 (9th Cir.1989). All inferences reasonably drawn from the alleged facts must be construed in favor of the nonmoving party.
 
 General Conference Corp. of Seventh-Day Adventists v. Seventh-Day Adventist Congregational Church,
 
 887 F.2d 228, 230 (9th Cir.1989),
 
 cert. denied,
 
 493 U.S. 1079, 110 S.Ct. 1134, 107 L.Ed.2d 1039 (1990).
 

 DISCUSSION
 

 None of the statutes at issue in this case gives plaintiffs a private right of action. Thus, plaintiffs’ challenges here are brought under the judicial review provisions of the Administrative Procedure Act (“APA”), 5 U.S.C. §§ 701-706. Plaintiffs’ action is based on a review of allegedly “final” agency actions as well as agency “failures to act.”
 

 The Forest Service moves under Rule 12(c) for judgment on the pleadings. It contends that plaintiffs’ Complaint fails to meet the requirements for judicial review under the APA because plaintiffs do not challenge final agency actions and they have not identified failures to perform mandatory statutory duties. Defendant-intervenors Robertson Ranch and Oregon Cattlemen’s Association have filed separate motions, primarily joining in the federal defendants’ motion.
 

 I.
 
 Final Agency Action
 

 The APA authorizes a court to “hold unlawful or set aside agency action, findings, and conclusions found to be ... arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law.” 5 U.S.C. § 706(2). To obtain judicial review under this section, a plaintiff must establish that the activities at issue are “final agency actions.”
 
 Lujan v. National Wildlife Federation,
 
 497 U.S. 871, 882, 110 S.Ct. 3177, 111 L.Ed.2d 695 (1990). For an agency action to be considered final under the APA, two conditions must be satisfied. First, the action “must mark the consummation of the agency’s decisionmaking process,” and second, it “must be one by which rights or obligations have been determined, or from which legal consequences will flow.”
 
 Bennett v. Spear,
 
 520 U.S. 154, 177, 117 S.Ct. 1154, 137 L.Ed.2d 281 (1997) (internal citations and quotations omitted).
 

 The Forest Service contends that it cannot glean from plaintiffs’ Complaint any agency action challenged by plaintiffs which are final and reviewable under the APA. The Forest Service argues that plaintiffs do not challenge a particular, discrete agency action, but rather they challenge the manner and degree to which the Forest Service is carrying out its conservation responsibilities in connection with the
 
 *MCCCLXXXIV
 
 administration of several grazing allotments in the Malheur National Forest. The Forest Service contends that plaintiffs are impermissibly asking the court to conduct a comprehensive review of how the
 
 agency
 
 manages
 
 grazing
 
 within these wild and scenic river corridors.
 

 Plaintiffs argue that they are properly challenging final agency actions. Of the three grazing decisions described above, plaintiffs clarify that they are challenging the Forest Service’s AOPs.
 
 [2]
 
 Plaintiffs argue that the AOPs are reviewable because they are site-specific plans which are clearly the consummation of the agency’s decisionmaking process. Plaintiffs point out that the AOPs specifically establish or adjust livestock grazing standards applicable to the allotment at issue and incorporate other standards, such as standards derived from the Forest Plan or relevant decisions regarding threatened or endangered species. AOPs are signed agreements between the Forest Service and the permittees, and they control that season’s grazing use on public lands. As such, plaintiffs argue, they are discrete final agency actions.
 

 Under the APA, plaintiffs cannot bring broad-sweeping challenges to ongoing agency activities.
 
 See. e.g., Ecology Center v. U.S. Forest Service,
 
 192 F.3d 922, 925-26 (9th Cir.1999) (holding that the Forest Service’s inadequate monitoring of a variety of Forest Plan-specified resource parameters was not a final agency action because it was several steps removed from any final agency action and did not have legal consequences flowing from its completion or rights arising from it).
 
 See also Montana Wilderness Ass’n v. U.S. Forest Service,
 
 314 F.3d 1146, 1149-50 (9th Cir.2003) (holding that Forest Service’s “routine maintenance work” on trails was not a final agency action subject to review). The Forest Service argues that AOPs are not the kinds of decisions that are reviewable under
 
 Ecology Center, Montana Wilderness,
 
 and other cases interpreting APA section 706(2). It argues that the AOPs cannot be said to mark the consummation of the agency decisionmaking process. Rather, according to the agency, an AOP can more appropriately be seen as serving to implement a decision by the Forest Service to authorize grazing that already has been made and for which the agency’s decisionmaking process has already been consummated. The Forest Service contends that the AOPs stay within the parameters of the grazing permit and/or AMP, and usually just make minor adjustments. Additionally, the Forest Service argues that no independent legal consequences flow from the AOPs because AOPs neither add nor take away rights that were not already conferred in the grazing permit or AMP.
 

 Plaintiffs contend, and I agree, that the changes made and the specific standards laid out in the AOPs should not necessarily be considered “minor.” While I assume from the parties’ representations that the agency sometimes makes minor adjustments through the AOP, plaintiffs
 
 *MCCCLXXXV
 
 have submitted sufficient evidence at this stage to show that such adjustments can be more significant. By way of example, plaintiffs have provided the court with the 2002 AOP for the Dollar Basin and Star Glade Allotments.
 
 [3]
 
 The AOP appears to incorporate changes in, for example, the “Unit Stocking and Rotation” requirements, based on a biological assessment that had been completed under the Endangered Species Act for bull trout. Plaintiffs contend that the standards and guidelines in the AOP relating to bull trout are contained in neither the relevant permit nor the AMP. These do not appear to be minor changes.
 

 Further, I do not understand the Forest Service’s argument that no legal consequences flow from an AOP. The 2002 AOP provides:
 

 All requirements of your Term Grazing Permit remain in force,
 
 unless specifically noted in the AOP.
 
 This
 
 signed AOP is your agreement to comply with the following provisions,
 
 as well as other instructions given to you, your employees, and contractors by the District Ranger.
 

 Exhibit A to Lacy Declaration at 1 (emphasis added). If the Forest Service incorporates standards in an AOP based on a biological assessment or biological opinion about a certain species that was completed after a given grazing permit was issued, like the bull trout example plaintiffs have given, I do not believe the Forest Service could contend that those standards are not binding requirements on the permittee. Simply because an AOP’s authority is drawn from the permit does not make the agency’s decision reflected in the AOP any less of a final agency action. Unlike ongoing monitoring or trail maintenance discussed in the cases cited above, the AOPs in this case are discrete, site-specific actions taken by the agency from which binding obligations flow. I conclude that plaintiffs have sufficiently pleaded challenges to final agency actions.
 

 To the extent that the Forest Service is still unclear about
 
 which
 
 AOPs plaintiffs mean to challenge as it relates to producing the administrative record for this case, I direct the parties to confer on this issue. The Forest Service also noted at oral argument that if plaintiffs challenge the 2003 AOPs, then it believes such a challenge is moot because the 2003 grazing season has come to an end. I do not believe the plaintiffs’ challenge is moot, but I make no decisions on this issue, as it is not properly before me.
 

 II.
 
 Failures to Act
 

 The APA provides that courts “shall [] compel agency action unlawfully withheld or unreasonably delayed.” 5 U.S.C. § 706(1). To establish a right of review under section 706(1), a plaintiff must identify a statutory provision mandating agency action.
 
 Center for Biological Diversity v. Veneman,
 
 335 F.3d 849, 854 (9th Cir.2003). Judicial review is appropriate if a plaintiff makes a showing “of agency recalcitrance ... in the face of a clear statutory duty or ... of such magnitude that it amounts to an abdication of statutory responsibility.”
 
 Montana Wilderness,
 
 314 F.3d at 1150. To reach the issue of whether an agency has unlawfully withheld or unreasonably delayed an action, a court must determine whether the plaintiff has sufficiently alleged a failure to perform a mandatory duty or whether the plaintiff is attempting to “evade the finality requirement with complaints about the sufficiency of an agency action ‘dressed up
 
 *MCCCLXXXVI
 
 as an agency’s failure to act.’”
 
 Ecology Center,
 
 192 F.3d at 926 (quoting
 
 Nevada v. Watkins,
 
 939 F.2d 710, 714 n. 11 (9th Cir.1991)).
 

 The Forest Service argues that plaintiffs do not bring proper failure to act claims. It argues that no clear statutory mandate underlies any of plaintiffs’ claims and that even if plaintiffs are found to have cited clear statutory mandates, the allegations in their Complaint cannot be construed as genuine failures to act.
 

 Plaintiffs argue that the Forest Service’s failure to implement grazing standards adopted and set by the wild and scenic river management plans, the relevant Forest Plan, and the AOPs is a failure to act reviewable under section 706(1) of the APA. Plaintiffs argue that the Forest Service’s duties under the statutes at issue in this case are analogous to the duties the Ninth Circuit examined in
 
 Montana Wilderness,
 
 the recent Ninth Circuit case cited above in reference to the final agency action requirement.
 

 A.
 
 Whether the Statutory Provisions on Which Plaintiffs Rely Create Mandatory Duties Giving Rise to a Right of Review Under APA Section 706(1)
 

 As noted above, the Ninth Circuit in
 
 Montana Wilderness
 
 held that trail maintenance was not a final agency action for purposes of APA section 706(2). The circuit also went on, however, to analyze the plaintiffs’ claims under section 706(1). The plaintiffs brought claims under a provision of the Montana Wilderness Study Act mandating that the Secretary of Agriculture “shall, until Congress determines otherwise,” administer specific wilderness study areas (“WSAs”) “to maintain their presently existing wilderness character and potential for inclusion in the National Wilderness Preservation System.” The Ninth Circuit found that the Wilderness Study Act “establishes a management directive requiring the Forest Service to administer the [WSAs] to ‘maintain’ wilderness character and potential for inclusion in the Wilderness System.”
 
 Montana Wilderness,
 
 314 F.3d at 1161. The court held that this duty “is a non-discretionary, mandatory duty that [the Forest Service] may be compelled to carry out under section 706(1).”
 
 Id.
 
 Plaintiffs argue that the statutory provisions on which they rely are analogous to the provision at issue in
 
 Montana Wilderness.
 

 First, plaintiffs allege that the Forest Service is under a mandatory duty to implement the comprehensive management plans the agency prepared for the Malheur and North Fork Malheur wild and scenic rivers. Plaintiffs cite to two WSRA provisions they believe give rise to this duty. Section 3(d)(1) of the WSRA provides that the Forest Service “shall prepare a comprehensive management plan ... to provide for the protection of the river values,” that the plan “shall address resource protection, development of lands and facilities, user capacities, and other management practices necessary or desirable to achieve the purposes of this chapter,” and that the plan “shall be coordinated with and may be incorporated into resource management planning for affected adjacent Federal lands.” 16 U.S.C. § 1274(d)(1). Plaintiffs also rely on WSRA section 12(a), which provides that the Forest Service “shall take such action respecting management policies, regulations, contracts, plans, affecting such lands ... as may be necessary to protect such rivers in accordance with the purposes of this chapter.” 16 U.S.C. § 1283(a).
 

 Second, plaintiffs allege that the Forest Service has a mandatory duty to protect and enhance the outstandingly remarkable values for which the Malheur and North Fork Malheur wild and scenic rivers were
 
 *MCCCLXXXVII
 
 designated. Plaintiffs rely on section 10(a) of the WSRA, which provides that “[e]aeh component of the national wild and scenic rivers system shall be administered in such manner as to protect and enhance the values which caused it to be included in said system without, insofar as is consistent therewith, limiting other uses that do not substantially interfere with public use and enjoyment of these values.” 16 U.S.C. § 1281(a).
 

 Finally, plaintiffs allege that the Forest Service has a mandatory duty to manage livestock within the wild and scenic river corridors consistently with Forest Plan standards. NFMA provides that “[r]esource plans and permits, contracts, and other instruments for the use and occupancy of National Forest System lands shall be consistent with the land management plans.” 16 U.S.C. § 1604(i).
 

 The Forest Service argues that the above cited statutory provisions are “simply devoid of any language that could be construed to give them the construction the Plaintiffs attempt to foist on them,” and that the duties referenced are “certainly not the kind to which it was contemplated that a Federal judge would try to compel obedience under 5 U.S.C. § 706(1).” Def. Memo, at 19-20. I agree with the Forest Service that the statutory provisions quoted above are not singular unconditional demands for the agency to take one specific action, but I believe they contain sufficiently clear statutory mandates and meaningful standards against which to judge the exercise of any discretion that could be afforded the Forest Service in carrying out these duties.
 

 The Ninth Circuit has recently held that WSRA section 5(d)(1), 16 U.S.C. § 1276(d), imposes a mandatory duty on the agency.
 
 Center for Biological Diversity,
 
 335 F.3d at 856. Section 5(d)(1) provides “[i]n all planning for the use and development of water related resources, consideration shall be given by all Federal agencies involved to potential national, wild, scenic and recreational river areas.” 16 U.S.C. § 1276(d)(1). This section of the WSRA relates to rivers constituting potential additions to the wild and scenic rivers system and is not at issue in this case. However, section 5(d)(1) is similar to section 3(d)(1), which is at issue in this case, and the court’s analysis is instructive. The Ninth Circuit rejected the Forest Service’s argument, one very similar to the argument the Forest Service makes in this case, that the section at issue did not impose a mandatory duty on the agency. The court relied on
 
 Montana Wilderness
 
 and distinguished another case the agency relies on in support of the instant motion,
 
 ONRC Action v. Bureau of Land Management,
 
 150 F.3d 1132 (9th Cir.1998), which held that an agency could not be compelled under APA section 706(1) to comply with policy statements and general guidelines set forth in statute. In
 
 Center for Biological Diversity,
 
 the court reasoned:
 

 As in
 
 Montana Wilderness,
 
 the requirement here that the Service shall “consider” eligible rivers is readily distinguished from the generalized policy statements that we considered in
 
 ONRC Action.
 
 The consideration requirement in this case is neither a statement of policy, nor a generalized instruction to federal agencies that may be overlooked. Rather, in the context of the WSRA designation process, the duty to consider eligible rivers while planning means that federal agencies must consider the future designation of an eligible river when planning for that river and its immediate area. Although, unlike the Study Act, § 1276(d)(1) does not require preservation or maintenance, it does require federal agencies to obtain site-specific information to discern the effect of any action on the river’s eligibility for designation. This consideration require
 
 *MCCCLXXXVIII
 
 ment does not necessarily preclude the agency from taking action, but it does require the agency to openly study, consider and discuss the action before taking it. Though substantively distinct, this duty is not distinguishable from the duty to “maintain” that we found mandatory in
 
 Montana Wilderness.
 
 In both cases, the applicable provision instructs the federal agency that it shall perform a task provided that the object sought to be conserved satisfies the statutory requirements. We thus conclude that the duty to consider, like the duty to maintain, constitutes a mandatory duty to act. The Center can obtain relief to the extent it can show that the Forest Service has failed to consider the effect of an adverse planning decision on an eligible river.
 

 335 F.3d at 856 (citation omitted).
 

 I am unable to find any principled distinctions between the statutory language at issue in this case and the language at issue in
 
 Center for Biological Diversity
 
 and
 
 Montana Wilderness.
 
 For example, I see no difference between the WSRA’s mandate that a wild and scenic river corridor “shall be administered in such a manner as to protect and enhance the values which caused it to be included in [the National Wild and Scenic Rivers System],” 16 U.S.C. § 1281(a), and the language at issue in
 
 Montana Wilderness,
 
 which provided that the Secretary “ ‘shall, until Congress determines otherwise,’ administer specific Wilderness Study Areas ... ‘to
 
 maintain
 
 their presently existing wilderness character and potential for inclusion in the National Wilderness Preservation System.’ ”
 
 Montana Wilderness,
 
 314 F.3d at 1148 (citing Pub.L. No. 95-150, 91 Stat. 1243 (1977)) (emphasis in opinion). The rest of the statutory provisions relied on by plaintiffs likewise contain directives to the agency preceded by the word “shall” that demand the agency arrive at a certain goal, address specific concerns, or take actions that are consistent with other plans. These provisions are far more than mere policy statements or generalized guidelines.
 

 I conclude that the duties identified by plaintiffs in this case are mandatory. I acknowledge the Forest Service’s position that each of these statutory provisions cannot be read in a vacuum and instead must be considered in the context of other provisions of WSRA and case law explaining that, at least with respect to the “protect and enhance” language, that the agency may have some discretion.
 
 See, e.g., Hells Canyon Alliance v. United States Forest Service,
 
 227 F.3d 1170, 1177 (9th Cir.2000) (noting that “[t]he mandate to ‘protect and enhance’ does not ... lead inexorably to the conclusion that permitting motorized use on both the wild and scenic portions of the river violates the statute”). However, the Ninth Circuit discussed the protect and enhance standard in the context of whether
 
 on the merits
 
 an agency decision was arbitrary and capricious, not in the context of whether the statutory provision at issue creates a duty actionable under APA section 706(1). The Forest Service is free to raise these arguments when the court is called on to determine whether the agency has complied with its statutory mandates.
 

 B.
 
 Whether Plaintiffs Have Properly Alleged “Genuine Failures to Act”
 

 The Forest Service next argues that even if these duties are mandatory, plaintiffs claims fail because they are not challenging “genuine failures to act.” In
 
 Ecology Center,
 
 the Ninth Circuit rejected the plaintiffs’ failure to act claim regarding forest monitoring in part because the court believed that the agency had conducted extensive monitoring and provided detailed reports.
 
 Ecology Center,
 
 192 F.3d at 926. Thus, the court concluded that the plaintiffs were not challenging a genuine failure
 
 *MCCCLXXXIX
 
 to act, but were essentially just unhappy with the way the agency had acted.
 
 Id.
 
 Similarly, in this case, the Forest Service argues that plaintiffs are simply challenging the overall management and implementation decisions on the lands at issue. The Forest Service argues that plaintiffs’ claims are not failure to act claims because they are of an action-based nature. For example, with respect to the first claim for relief, plaintiffs allege that the Forest Service has failed to comply with its mandatory duties
 
 “by authorizing
 
 livestock grazing practices on federal lands within these wild and scenic river corridors that cause the repeated and continuous violation of the specific standards and guidelines .... ” Complaint at ¶ 83 (emphasis added).
 

 The Forest Service’s argument seems at least somewhat logical — that a failure to act cannot be based on an affirmative action that plaintiffs aren’t happy with. However, the Forest Service attempted to make a similar argument in
 
 Montana Wilderness,
 
 which the Ninth Circuit rejected. In
 
 Montana Wilderness,
 
 the Forest Service relied on
 
 Ecology Center
 
 and argued that even if the statute provided a specific mandatory duty, plaintiffs had not alleged facts demonstrating the agency’s complete failure to act. The Ninth Circuit found that
 
 Ecology Center
 
 was distinguishable: “In
 
 Ecology Center,
 
 the duty was simply to monitor and the record demonstrated that the Forest Service had performed several actions to comply with this duty. Here, the duty is to maintain a specified goal, i.e., wilderness character and potential for inclusion in the Wilderness System.”
 
 Montana Wilderness,
 
 314 F.3d at 1151. The Ninth Circuit went on to conclude that “[t]he simple fact that the Forest Service has taken some action to address the Act is not sufficient to remove this case from section 706(1).”
 
 Id.
 
 I also note that when the Ninth Circuit discussed the genuine failure to act requirement, it had a record before it. In contrast, there is no record before the court on the instant motion and all of plaintiffs’ allegations regarding the ecological conditions and grazing practices at issue in this case must be taken as true.
 

 A look at the manner in which the claims were pleaded in both cases is also instructive in determining whether plaintiffs have alleged a genuine failure to act. In
 
 Montana Wilderness,
 
 the plaintiffs claimed that the Forest Service violated the Act by failing to maintain seven Study Areas’ wilderness character and potential for wilderness designation when it
 
 “allowed], encourag[ed],
 
 and/or fail[ed] to act to prevent motorized vehicle use of [the Study Areas] beyond what existed in 1977.”
 
 Id.
 
 at 1149. The court even noted that Count I of plaintiffs’ complaint, which the court found to be actionable under 706(1), alleged that “the Forest Service’s
 
 ‘actions and inactions’ increased
 
 the type and amount of motorized activity in all Study Areas, resulting in diminished wilderness character and potential for inclusion in the Wilderness System as it existed in 1977.”
 
 Id.
 
 Thus, the allegations at issue in
 
 Montana Wilderness
 
 included action-based allegations, which I find to be similar in nature to plaintiffs’ allegations in this case.
 

 The Forest Service accuses plaintiffs of pleading “dressed up” challenges to the sufficiency of actions when they are really contending that the agency has acted too much — that the agency has acted to allow too much grazing, too many allotments, for seasons that are too long. The same could be said, however about the allegations in
 
 Montana Wilderness
 
 — that the plaintiffs were alleging that the agency acted too much by allowing increased motor vehicle use. Likewise, in
 
 Center for Biological Diversity,
 
 it could be said that the plaintiffs were complaining that the agency acted too much by affirmatively making several planning decisions without considering the potential for designating the rivers at
 
 *MCCCXC
 
 issue. In both of these cases, however, the Ninth Circuit found the plaintiffs to be properly challenging failures to act.
 
 [4]
 
 I conclude that plaintiffs have adequately pleaded failure to act claims under APA section 706(1).
 

 III. NEPA/
 
 Rescissions Act Claim
 

 The Rescissions Act established a temporary exemption from NEPA review for grazing permits that were up for reissuance. The Act also required the Forest Service to “establish and adhere to a schedule” for conducting and completing NEPA analyses for all allotments within each Forest System Unit in accordance with NEPA. Sec. 504(a), Pub.L. No. 104-109 Stat. 212 (1995). Plaintiffs allege that the Forest Service violated NEPA and the Rescissions Act by authorizing grazing on the allotments at issue in the absence of updated NEPA analyses and without adhering to the established schedule. Defendants argue that even if the Rescissions Act mandate regarding a schedule for NEPA compliance constituted a clear statutory mandate, the injunctive relief requested by plaintiffs' is improper because of the effect of an appropriations bill passed subsequent to the filing of plaintiffs’ Complaint.
 

 As it is currently pleaded, plaintiffs appear to be bringing their NEPA/Rescis-sions Act claim as a request for review of final agency actions under APA section 706(2). Based on plaintiffs’ response to the agency’s motion, however, they appear to be considering asking for leave to amend their Complaint to plead an alternative claim for review under section 706(1). Plaintiffs also state that they intend to seek leave to amend their Complaint in light of the action taken by Congress subsequent to their filing the Complaint. I will allow plaintiffs leave to clarify this claim and their request for relief as it relates to any alleged violations of NEPA or the Rescissions Act. I make no rulings at this point on this claim.
 

 CONCLUSION
 

 Defendants’ Motions for Judgment on the Pleadings and Motion to Dismiss (# 46, # 53, # 54) are denied. The parties are directed to confer regarding a schedule for the case and contact the court with a proposed schedule.
 

 [1]
 

 . The Forest Service notes that as of this year, the Forest Service no longer issues AOPs. Instead, the Forest Service issues annual operating instructions (“AOIs”). For ease of reference, I will refer to these documents as AOPs.
 

 [2]
 

 . Plaintiffs explain that of the three relevant decisions, plaintiffs
 
 must
 
 challenge the AOPs. Plaintiffs contend that the AMPs for the six allotments at issue and their accompanying NEPA documents are extremely outdated or have never been developed. Those that have been completed were prepared as long ago as 1965 and only as recently as 1983. Further, as noted above, the grazing permits are issued only every ten years, with the understanding that specific grazing management direction will be enumerated in either an AMP or a yearly AOP. Plaintiffs contend that they cannot challenge the AMPs and permits in this case because they have been reissued without the required NEPA analysis, which gives rise to plaintiffs’ fourth claim for relief. Essentially, plaintiffs argue that they have no choice but to challenge the AOPs.
 

 [3]
 

 . The court may review a document extrinsic to the complaint if the authenticity of the document is not contested and the complaint necessarily relies upon it.
 
 Parrino v. FHP, Inc.,
 
 146 F.3d 699, 706 (9th Cir.1998).
 

 [4]
 

 . The Forest Service relies on one additional recent Ninth Circuit case on this subject,
 
 Confederated Tribes of the Umatilla Indian Reservation v. Bonneville Power Administration,
 
 342 F.3d 924 (9th Cir.2003). The statute at issue in that case would appear to have imposed a mandatory duty on the agency to exercise its hydroelectric power responsibilities "in a manner that provides equitable treatment” for fish and wildlife. However, the Ninth Circuit held that the plaintiffs in that case had no right of review under section 706(1): "BPA has no mandatory duty to act because it has no general statutory duty to demonstrate that it has treated fish and wildlife equitably. It has a duty to demonstrate compliance with the mandate only in relation to final decisions that will significantly impact the fish and wildlife population.”
 
 Id.
 
 at 930. Although the conclusion reached in that case is somewhat difficult to reconcile with the conclusions reach in
 
 Montana Wilderness
 
 and
 
 Center for Biological Diversity,
 
 I find that the case is sufficiently distinguishable from the instant case and does not affect my conclusion. The Ninth Circuit in
 
 Confederated Tribes
 
 based its conclusion on a prior decision in which it had found that the mandatory duty set forth in the statute at issue was only triggered by certain actions.
 
 Id.
 
 at 930-931 (discussing
 
 Northwest Environmental Defense Center v. Bonneville Power Admin.,
 
 117 F.3d 1520 (9th Cir.1997)). In this case, the Forest Service comes forward with no authority for the proposition that the statutory mandates are only triggered in limited situations not at issue here.